## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | |
| KENNETH J. ASHCRAFT and | ) | Case No.  20-12725 (BLS) |
| DEBORAH D. ASHCRAFT, | ) | |
| | ) | Docket No. 61, 84 |
| Debtors. | ) | |

Elaina L. Holmes, Esquire
Doroshow Pasquale Krawitz & Bhaya
1202 Kirkwood Highway
Wilmington, DE  19805
*Counsel for Debtors*

William F. Jaworski, Esquire
Chapter 13 Trustee
824 N. Market Street – Suite 1002
Wilmington, DE  19801
*Chapter 13 Trustee*

Catherine DiLorenzo, Esquire
Stern & Eisenberg Mid-Atlantic, PC
200 Biddle Avenue, Suite 107
Newark, DE  19720
*Counsel for Citigroup Mortgage Loan Trust*

### OPINION[1]

There are two mortgage-related contested matters before the Court.  First is Citigroup's Motion for Relief from the Automatic Stay (the "Stay Relief Motion"),[2] which seeks relief to allow the Creditor to exercise its remedies via foreclosure upon the Debtors' home.  Second is the Debtors' objection[3] to the prepetition claim filed by Citigroup Mortgage Loan Trust Inc. Asset-Backed Pass-Through Certificates, Series 2007-AMC2, U.S. Bank National Association, as Trustee (hereinafter "Citigroup" or the "Creditor").

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), (G) and (O), and the Court possesses statutory and constitutional authority to issue a final order in this matter.

[2] Docket No. 61.

[3] Docket No. 84.

For the reasons that follow, the Court will sustain, in part, the Debtor's objection to Citigroup's claim: that prepetition arrearage claim will be reduced by the sum of $9,839. The Stay Relief Motion will be denied, and the Court will deem and declare the Debtors current on all post-petition mortgage payments and all related fees or other obligations through April 30, 2024.

## BACKGROUND

Kenneth and Deborah Ashcraft own a home (the "Property") in Hockessin, Delaware that is their primary residence. On October 18, 2006, the Ashcrafts executed a Note in favor of lender Argent Mortgage Company ("Argent") in the amount of $212,000 with interest payable at an annual rate of 3.875%, to be paid over thirty (30) years.[4] To secure the repayment of the sums due under the Note, the Debtors executed a Mortgage also dated October 18, 2006, encumbering the Property.[5] The Mortgage and Note were later transferred from Argent to Citigroup, which is the present holder of the Mortgage and Note.[6] The record reflects that Citigroup's agent and the current servicer of the mortgage and note is Cenlar FSB ("Cenlar").[7]

As discussed in exhaustive detail below, the Ashcrafts became embroiled in a dispute with Citigroup starting in April 2016 over the status of payments, fees, and charges due under the mortgage. The dispute escalated and in 2019 Citigroup informed the Ashcrafts that it intended to pursue its remedies, including foreclosure on the Property, on account of what it asserted were missing payments and significant accrued and unpaid fees and charges.

To prevent the loss of their home, and to afford an opportunity negotiate with the Creditor, the Ashcrafts filed this Chapter 13 case on October 20, 2020. William F. Jaworski,

---

[4] Creditor's Ex. 2.
[5] Creditor's Ex. 1.
[6] Creditor's Ex. 3.
[7] Tr. (12/19/23) at 18:21-23.

2

Esquire was appointed the Chapter 13 Trustee to oversee the case, and the record reflects that a Chapter 13 plan was confirmed on December 20, 2021.[8]

These Chapter 13 proceedings have been characterized almost exclusively by disputes between the Debtors and the Creditor over whether mortgage payments were overdue and how Citigroup or its servicer was calculating or accounting for the Debtors' obligations. Citigroup filed a motion for relief from the stay three months after the Petition Date[9] due to the Debtors' admitted failure to remit monthly post-petition mortgage payments. That motion was resolved by a negotiated lump sum payment in June 2021,[10] at which time the Debtors were determined to be current on their post-petition mortgage payments.[11] The motion was withdrawn by Citigroup after receipt of the payment.[12]

On August 2, 2022, Citigroup filed another motion for relief from the automatic stay which is the matter presently before the Court,[13] alleging that the Debtors had again fallen significantly behind on their post-petition mortgage payments. The Debtors filed an opposition to the Stay Relief Motion[14] and an objection to Citigroup's proof of claim.[15] The Court conducted a series of hearings and status conferences with the parties in the hope of resolving the dispute or at least narrowing the issues for trial. On March 30, 2023, the Court ordered the

---

[8] Docket No. 36.
[9] Docket No. 18.
[10] Docket No. 29.
[11] Tr. (12/19/23) at 125:8-16.
[12] The Court notes that significant trial time was spent discussing the first motion for relief from stay and its resolution. While that motion does not technically have any bearing on the instant Stay Relief Motion that was filed over a year later, it is relevant to frame the repeated difficulties the Debtors have encountered in obtaining account information from Cenlar and getting the payments that they did tender timely processed and credited. The first motion for relief from stay will be discussed in more detail *infra*.
[13] Docket No. 61.
[14] Docket No. 65.
[15] Docket No. 84.

parties to proceed to mediation before another Judge in this Court.[16]  That exercise was

unsuccessful, and the contested matters were set for trial to commence in December 2023.[17]

Trial began on December 19, 2023 and the Court heard the testimony of Mrs. Ashcraft

and Mr. Raymond Crawford, a litigation specialist at Cenlar.  Testimony could not be concluded

that day, and the matter was carried to January 24, 2024.  Direct testimony and cross-

examination on both witnesses was conducted and concluded, and the Court admitted scores of

documentary exhibits into the evidentiary record.  At the conclusion of trial, the Court took the

matters under advisement.  This is the Court's ruling on Citigroup's Stay Relief Motion and the

Debtors' objection to Citigroup's proof of claim.

## LEGAL STANDARD

### A.  The Stay Relief Motion

Bankruptcy Code § 362(d) provides:

(d)     On request of a party in interest and after notice and a hearing, the court
shall grant relief from the stay provided under subsection (a) of this section, such
as by terminating, annulling, modifying, or conditioning such stay - -

(1)     for cause, including the lack of adequate protection of an interest in
property of such party in interest;

(2)     with respect to a stay of an act against property under subsection
(a) of this section, if - -

(A)     the debtor does not have an equity in such property; and

(B)     such property is not necessary to an effective
reorganization[.][18]

---

[16] The Court expresses its deep appreciation to The Honorable Thomas Horan for his efforts to resolve this thorny
dispute.
[17] Debtors' counsel filed a motion to withdraw, which the Court denied on the record at a hearing on November 21,
2023.  Docket No. 91.
[18] 11 U.S.C. § 362(d).

Under Section 362(d)(1), stay relief may be granted for "cause." Although the Code does not define "cause," the Third Circuit has held that courts should consider the totality of circumstances in each particular case to determine whether cause for relief from the stay exists.[19]

The party seeking relief from the automatic stay "bears the burden of establishing a *prima facie* case of cause."[20] The movant may establish cause by showing that the balance of hardships from not obtaining relief tips significantly in its favor.[21] Evidence of a debtor's failure to make post-petition payments also can constitute "cause" for granting relief from the automatic stay.[22] Once the movant establishes cause, the burden of proving adequate protection shifts to the debtor.[23]

Alternatively, under Section 362(d)(2), a movant may seek relief from the stay if the debtor lacks equity in the property, and "such property is not necessary to an effective reorganization."[24] The movant has the burden of proving lack of equity in the property and the debtor has the burden of proving the feasibility of a reorganization.[25]

---

[19] *In re Aleris Int'l, Inc.*, 456 B.R. 35, 47 (Bankr. D. Del. 2011) (citing *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997) (internal punctuation omitted)).

[20] *Genrette v. Bank of New York Mellon Trust Co., NA (In re Genrette)*, Civ. No. 18-920 (MN), 2019 WL 4740053, *3 (D. Del. Sept. 27, 2019) (quoting *Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.)*, Civ. No. 96-412-SLR, 1997 WL 129346, *4 (D. Del. Mar. 4, 1997)). "A *prima facie* case requires a showing by the movant of 'a factual and legal right to the relief that it seeks.'" *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006).

[21] *Aleris Int'l*, 456 B.R. at 47 (citing *Atl. Marine, Inc. v. Am. Classic Voyages, Co. (In re Am. Classic Voyages, Co.)*, 298 B.R. 222, 225 (D. Del. 2003)).

[22] *Genrette*, 2019 WL 4740053, *4 (citing *In re Jones*, 284 B.R. 92 (Bankr. E.D. Pa. 2002), *aff'd*, 308 B.R. 223 (E.D. Pa. 2003)).

[23] *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 304 (Bankr. D. Del. 2011). 11 U.S.C. § 362(g) provides that in a hearing for relief from the stay under § 362(d), "the party requesting such relief has the burden of proof on the issue of the debtor's equity in the property;" and "the party opposing such relief has the burden of proof on all other issues."

[24] 11 U.S.C. §362(d)(2)(B).

[25] 11 U.S.C. § 362(g). *See also JER/Jameson*, 461 B.R. at 304.

**The Claim Objection**

The burden of proof for a claim filed in a bankruptcy proceeding "rests on different parties at different times."[26] Initially, the claim holder must establish the *prima facie* validity of the claim.[27] Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure (i.e., on that includes the facts and documents necessary to support the claim), constitutes *prima facie* evidence of the validity and amount of the claim.[28] The claim objector must them produce evidence that, "if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."[29] At that point, the burden shifts back to the claim holder to prove the validity of the claim by a preponderance of the evidence.[30] The ultimate burden of persuasion here rests with Citigroup as the claim holder.[31]

## DISCUSSION

### A. Citigroup's Motion for Relief from Stay

At trial, the Debtors offered unrebutted testimony that they have considerable equity in the Property – that is to say, the Property is worth more than what is owed to Citigroup on the mortgage.[32] It is undisputed that the Property is the Ashcrafts' home and is thus necessary for an effective reorganization. Accordingly, the initial inquiry is whether Citigroup has proven that the Debtors have materially failed to make post-petition mortgage payments to the extent that, in order to adequately protect its interest here, Citigroup must have relief from the automatic stay to pursue foreclosure remedies against the Property. To the extent that stay relief is not granted, the

---

[26] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).
[27] *Id.*
[28] Fed. R. Bankr. P. 3001(f). *In re Samson Res. Corp.*, 569 B.R. 605, 615 (Bankr. D. Del. 2017).
[29] *Allegheny*, 954 F.2d at 173.
[30] *Id.* at 174.
[31] *Samson Res.*, 569 B.R. at 615.
[32] Tr. (12/19/23) at 197:4-198:8. Citigroup's proof of claim alleges a secured claim of approximately $258,000. Mrs. Ashcraft testified that she believes the Property is worth over $400,000, and this testimony was not seriously challenged at trial.

parties have requested that the Court determine the amount of any post-petition arrearage under the mortgage.

At trial, Citigroup (through its servicer, Cenlar) provided testimony regarding its policies and procedures for administering mortgages. Cenlar's corporate policies and practices, as described in testimony adduced at trial, include issuing account statements identifying the correct amount that may be due from a homeowner in a particular month, including principal, interest, escrows and any fees or charges.[33] When payments are received, it is the servicer's responsibility to properly apply the funds to the mortgage obligations and promptly reflect those payments by updating the customer's account. Once a homeowner is determined to have filed for bankruptcy relief, the account file is moved to Cenlar's bankruptcy department.[34] The record indicates that that office is staffed with personnel specifically trained to deal with accounts that are either in foreclosure or in bankruptcy proceedings.[35]

In the event of disputes or discrepancies in payments, Cenlar offered testimony that the company's policies required that customers should be informed of missing payments via a statement that would accurately reflect any payments received, how those payments were applied and what amounts remain due or outstanding. Similarly, the testimony reflects that any phone calls from a customer should be recorded and archived, along with notes by the Cenlar representative made during and after the call, to be maintained in the customer's particular account file.[36] If a customer wrote a letter or other correspondence to Cenlar with a question

---

[33] Tr. (12/19/23) at 19:2-5.

[34]     Q. Can you please tell the Court what actions are taken when they receive a notice of bankruptcy filing?
    A. Yes. Notice of bankruptcy is received based on what is going on with the loan, a hold is placed on the loan, the loan is assigned to the bankruptcy department. That is the only department that is working the loan.
Tr. (12/19/23) at 31:10-18.

[35] Id. at 32:14-33:6.

[36] Id. at 68:2-10; Tr. (1/24/24) at 119:7-24.

about billing, applicable charges or other issues with their account, the testimony reflects that those materials – and the response provided by the servicer – should also be maintained and stored in the electronic customer account file.[37]

Unfortunately, the testimony at trial revealed substantial daylight between Cenlar's policies and standards for managing mortgage accounts, and its actual practices. As discussed in detail below, the monthly statements and invoices issued to the Ashcrafts regularly failed to account for payments made, contained inaccurate or misleading information as to when – or even whether – payments were due, and identified sizable amounts immediately due (well in excess of the standard monthly mortgage payment) with no explanation and with no apparent basis for the amount alleged to be due.

Days of testimony by Mrs. Ashcraft revealed a constant and unsuccessful effort by the Debtors to obtain guidance or an explanation for the seemingly random large amounts that appeared on her mortgage statement. As noted below, numerous letters she wrote to Cenlar were introduced into evidence by her, but do not appear in Cenlar's files and were not meaningfully responded to. Mrs. Ashcraft testified convincingly that she called the mortgage servicer repeatedly (in addition to writing letters): she made little headway, but even more importantly, Cenlar shows no record of calls from Mrs. Ashcraft that, according to Cenlar's stated policies, should have been recorded and archived.[38]

---

[37]    A.    [I]f a letter is sent in, then the letter is sent to the appropriate department to review and respond to the letter. You have a written correspondence.
Tr. (12/19/23) at 64:11-15.
[38]    Q.    And is there any record of a call in the account notes?
    A.    No, sir, there's no record in the call log and there's no record within the notes.
    Q.    Does Cenlar have any call recordings for a call with the Ashcrafts in 2022?
    A.    Based on the calls I reviewed, no call recordings from 2022.
Tr. (1/24/24) at 121:14-20.

A brief survey of the extensive trial testimony reveals a homeowner trying hard to make sense of billings and mortgage statements that made little sense. At risk here was the home the Ashcrafts have lived in for decades, and Mrs. Ashcraft testified credibly at trial that, at all points, she wanted only to pay what she owed, get the accounting sorted out and keep her home.

### i.  **Citigroup's Prior Motion**

As noted briefly above, Citigroup filed and ultimately resolved a stay relief motion in this case prior to the Motion that is presently before the Court. It was undisputed that the Ashcrafts had gotten several months behind in their post-petition mortgage obligations, and in early 2021 counsel for the Debtor and Cenlar negotiated a lump sum payment amount that the two sides agreed would resolve that stay relief motion and bring the Ashcrafts current on the mortgage.

Pursuant to that agreement, Mrs. Ashcraft prepared and sent in by mail separate checks for each of the months covered by the agreed lump sum payment.[39] Weeks passed, and Mrs. Ashcraft contacted the servicer to confirm receipt of the payments and that she was indeed current on her mortgage. Unfortunately, Mrs. Ashcraft was informed that no payments had been received and therefore she was still in material default on the mortgage to her home. At considerable personal expense, she stopped payment on all of the checks (which she assumed had been lost) and made arrangements for direct and immediate replacement payment via cashier's check to Cenlar, which was negotiated by Cenlar.[40]

The problem continued, however, when Cenlar then attempted to negotiate the collection of checks that Mrs. Ashcraft had stopped payment upon. Those checks bounced (costing the Ashcrafts more bank fees) and riddled the mortgage payment history with a collection of notations for payments received and then reversed for insufficient funds. The record reflects it

---

[39] Tr. (12/19/23) at 113:20-24; 114:1-5.
[40] Tr. (12/19/23) at 117:12-24; 118:1-21.

required substantial effort by the Debtors and their lawyer in 2021 to sort this mess out: indeed, it was only at trial in December 2023 that the two sides were able to agree that the Ashcrafts were in fact current on their mortgage obligations as of June 2021 by virtue of the payment resolving the first stay relief motion.[41]

### ii.    The Second Motion

Not long after resolution of the first stay relief motion, Citigroup alleges that the Debtors again fell behind in their post-petition mortgage payments. Specifically, Citigroup offered evidence in the form of a pay history admitted into evidence as Creditor's Exhibit 4 (the "Pay History").[42] That document reflects the stopped checks from May 2021 referenced above, and indicates that the Debtors missed payments in July, November, and December 2021. The instant Stay Relief Motion was filed on August 2, 2022[43] on account of these alleged missed payments.

At trial, Mrs. Ashcraft acknowledged that the July 2021 payment did indeed bounce because she had written the check for that month on the wrong bank account.[44] It is her testimony that she promptly submitted a replacement check, but that payment is not shown on the Pay History.[45]

Mrs. Ashcraft walked the Court through multiple account statements that she received from Cenlar. Those monthly statements are at best confusing, and at worst wrong or unsupported. For example, Debtors' Exhibit 49 was admitted at trial and is the mortgage statement for October 2021. Perplexingly, the statement (prepared by and sent to the Debtors by

---

[41]    THE COURT: So just so we can all sing largely from the same hymnal, as of June 10, when the parties entered into a court-approved stipulation, the debtors were current. They may have been behind on the 11th because the payment would have been due on the 10th or something like that, but as of that date, everybody is current.
Tr. (12/19/23) at 125:8-16.
[42] Creditor Ex. 4.
[43] Docket No. 61.
[44] Tr. (12/19/23) at 128:2-20.
[45] *Id.* at 129:7-21.

the servicer) showed a payment due date of February 2022.[46] The following month's statement,

for November 2021, reflects a due date of March 2022,[47] and the February 2022 statement shows

a due date of May 2022.[48] No explanation was provided to the Ashcrafts at the time, nor to the

Court at trial, for the monthly statements that would appear to indicate that nothing was currently

due.

In addition to the confusing statements from the servicer, Mrs. Ashcraft testified that she

had no confidence that the monies she paid were being properly accounted for. For example, in

May 2022, Mrs. Ashcraft testified that she paid her mortgage twice (for a total of $3,827.14) and

then in June 2022 received a statement identifying a past due amount of $5,541.64.[49] Cenlar's

Payment History provides no support for the $5,541.14 figure, and no evidence was offered at

trial to suggest that the statement was in fact accurate.

Just a month later, in July 2022, the Debtors received a statement showing a past due

amount of $10,683.70.[50] Mrs. Ashcraft was unable to understand how the figure had nearly

doubled in a month,[51] and no clarification or explanation of the facially confusing accounting

was provided to her at the time or offered at trial.

---

[46] *See* Debtors' Ex. 49; Tr. (12/19/23) at 137:22-138:2.
[47] *See* Debtors' Ex. 50.
[48] *See* Debtors' Ex. 54.
[49] *See* Debtors' Ex. 56, 57 and 58;
> THE COURT: Hang on, can I just make sure that I'm perceiving the witness's testimony and the tabulation accurately?
> MS. HOLMES: Yes.
> THE COURT: The witness testified that in May of 2022, she paid twice, $3,827.14, and then in the following month received an invoice identifying a payment amount due of $5,531.14. Is that correct?
> MS. HOLMES: That's correct, Your Honor.

Tr. (12/19/23) at 162:7-17.
[50] *See* Debtors' Ex. 62.
[51]
> A: Okay, so this is the next statement that I received dated for July 1st, 2022 showing a due date of August 1st, 2022. However, suddenly the past unpaid amount skyrocketed to $10,693.70 in addition to the normal monthly payment, bringing it to a total of $12,397.84.
> Q: What was your reaction when you got that?
> A: Well, I was seriously questioning it, and I think I had contacted your office about it, because I did not understand how the difference, why I went from June 1st, having not paid the past due

The Debtors offered into evidence Exhibit 59, which was a letter Mrs. Ashcraft wrote to Cenlar seeking answers on the billing and accounting on her mortgage. She testified at trial as follows:

> A: Yep. So this is the letter that I wrote in June of 2022. I sent this along with stapled to it was my June 2022 regular monthly payment, according to the statement that I received. In this letter, I questioned the past due amount, why I was being billed that past due amount, and also why did no statement show a due date for the June and the past due amount not being due until September 1st.
>
> I also stated in this letter that, you know, I had been making this additional past due amount of $2,113 for the past four bills, and I don't see where they were being properly credited, nor did I understand what the past due amount of $2,113 represented. Additionally, I questioned about the distributions to Cenlar under the bankruptcy, because it just seemed like it was a low amount. And I just said that I would not pay any additional amount, meaning the past due amount, until I heard back from them. So I had made the regular monthly payment for June, but I did not pay that $2,113, hoping to get a response from them.[52]
>
> .... So I know that they got the letter because my June statement was stapled to the letter, and they did cash the check.[53]

Mrs. Ashcraft never received a response to her letter, and Cenlar's witness testified that he saw no letters when he reviewed the Ashcrafts' account file.[54]

Mrs. Ashcraft testified that she wrote many, many letters to Cenlar that were included with her mailed payments. Those letters were admitted as Debtors' exhibits into evidence,[55] but

---

amount of $2,113 on the June 1st statement but I made the regular monthly payment, according to the statements, that should have been the only amount I was past due. This July payment now shows me $10,683.70 in arrears in addition to the July monthly payment, making a demand for $12,397.84. I did not understand why suddenly I owed $10,000. It wasn't clear to me. And the payment history that we received during discovery actually doesn't go that far, does not cover that.

Tr. (12/19/23) at 167:16-24; 168:1-10.

[52] Tr. (12/19/23) at 163:24; 164:1-24; 165:1-3.

[53] Tr. (12/19/23) at 165:18-21.

[54] Tr. (12/19/23) at 63:22-24.

[55] *See* Debtors' Ex. 11 (letter dated December 26, 2018); Debtors' Ex. 12 (letter dated February 28, 2019); Debtors' Ex. 23 (letter dated January 10, 2020); Debtors' Ex. 36 (letter dated April 26, 2021); Debtors' Ex. 46 (letter dated July 1, 2021); Debtors' Ex. 59 (letter dated June 11, 2022). The Court also notes that numerous copies of the mortgage statements that Mrs. Ashcraft submitted to Cenlar with her monthly payments contained written requests to Cenlar for an explanation of the billing and accounting. *See, e.g.*, Debtors' Ex. 52 (containing handwritten

it is troubling to the Court that they appear nowhere in Cenlar's files. Mrs. Ashcraft testified credibly that she never received a meaningful or informative response to any of the letters or written inquiries she submitted.

This next part is important: Mrs. Ashcraft testified credibly and at length that, throughout this time period, she repeatedly called Cenlar for guidance and answers on the status of her account. She testified that she spent considerable time on hold and, when she finally got a live person on the line, the only information she typically got was that her account was "under review" and that she would be contacted with further, helpful information.[56] Mrs. Ashcraft testified that, despite her calls, she never received a call back or any useful information.[57]

Why is this important? Because Cenlar's position is that, for the relevant period, Mrs. Ashcraft never called about her mortgage. The undersigned listened to two solid days of Mrs. Ashcraft's testimony, and one thing is clear: there is zero chance that she failed to call the company. She testified credibly to her stress and constant frustration in trying to sort out this mess. There is no doubt that she called Cenlar not once, but repeatedly, and all to no avail.

Critically, Mrs. Ashcraft testified on more than one of her many calls, the representative told her to stop submitting any payments that were less than the full $12,000 amount demanded and that it would otherwise no longer accept her payments.[58] Cenlar and Citigroup vigorously

---

inquiry: "Why are you charging us for hazard insurance when we already have homeowner's w/ State Farm for the past 10 years?").
[56] Tr. (12/19/23) at 169:12-16.
[57] Tr. (12/19/23) at 171:8-11.
[58]   Q: So in terms of September of 2022, did you make a payment?
       A: No, I did not.
       Q: Why not?
       A: Because when I called Cenlar, they told me they could not accept any payment less than that full amount that was due, due and owing on the statement. I had asked them, you know, had anybody answered, or you know, who was looking at my inquiry when I wrote my letter in June of 2022 requesting why have I been paying all these past due amounts, and she said that that was referred to the research department. I asked how long it would take before somebody would get back to me, and she said, well, it should be about a week.
       I called back the following week, they said, oh, it's going to be another week. And this

deny that such a phone call occurred, or that such advice and direction was given to the

Ashcrafts. In support of its argument, Creditor notes that there is no record of such a call.[59] But

there are essentially no records of calls, and the Court is confident that many – perhaps dozens –

of calls were indeed made. The record supports this Court's finding that Mrs. Ashcraft was

indeed directed by her mortgage servicer to cease making payments if she would not or could not

pay the full amount, as to which she had requested in writing an explanation.[60]

      The trial record reveals a host of payments missed and made, and accounting and billing

that is both impenetrable and demonstrably wrong in places. In the context of the Stay Relief

Motion, it is incumbent upon the Court to sift through the evidence and identify the post-petition

arrearage, if any, and thereupon direct payment of that arrearage to provide Citigroup with

adequate protection of its interest in the Property.[61] Here, the competing testimony and

accounting records do not provide a reliable basis for the Court to fix with precision the post-

petition amounts due from the Ashcrafts, and indeed they dispute that they were materially in

arrears at the time the current dispute arose. To the extent the Ashcrafts were behind on one or

more payments, that problem was compounded by the confusing and unsupported billing

statements and a consistent failure to communicate with the customer on basic questions that go

to the heart of the servicer's business.

      The Court has found that Cenlar did in fact direct Mrs. Ashcraft to stop making her

mortgage payments. Typically, a debtor who decides to withhold rent or mortgage payments

during a dispute is expected to escrow or segregate those monies for payment when the dispute is

---

went on for probably something like 90 days, repeated phone calls.
Tr. (12/19/23) at 174:5-17; 175:20-24; 176:1-18.
[59] Tr. (1/24/24) at 120:4-121:22.
[60] Tr. (1/24/24) at 123:24-124:21.
[61] *Genrette*, 2019 WL 4740053, *4 (citing *In re Jones*, 284 B.R. 92 (Bankr. E.D. Pa. 2002), *aff'd*, 308 B.R. 223 (E.D. Pa. 2003)).

resolved.[62] Here, however, it was the Creditor (through its agent) that directed the Debtors to stop making payments. It demanded payment in full of a large and questionable sum, as to which the Debtors had repeatedly requested an explanation and received no response.

It would be profoundly inequitable to conclude this trial by finding the Creditor's accounting and customer service practices largely caused the problem, but then place the Debtors in immediate, material default on the mortgage by requiring prompt remittance of the withheld mortgage payments. Accordingly, the Court will find and conclude that the Debtors are current under their post-petition mortgage obligations (including but not limited to principal, interest, escrows, fees, and charges) through April 30, 2024. Debtors' next regular monthly payment shall be due for the month of May 2024.

## B. **Debtor's Objection to Claim No. 9**

On December 28, 2020, Creditor timely filed Claim No. 9 asserting that the Ashcrafts owe $258,625.05 on account of the mortgage on the Property. Also in its proof of claim, Creditor maintains that the prepetition arrearage on the mortgage totals $45,287.24. The Debtors have objected to Claim No. 9 and assert that both the gross amount and the prepetition arrearage are "inaccurate and inflated."[63] Citigroup has carried its initial burden by filing the executed proof of claim, which enjoys *prima facie* validity by operation of Bankruptcy Code § 502(a).[64]

In the Debtors' objection, they provide a schedule of prepetition payments that they contend were made to and negotiated by the Creditor but were never properly applied to their account.[65] The schedule identifies one payment from 2016 and four payments from 2018 that

---

[62] *See, e.g.*, 11 U.S.C. § 362(l)(1)(B) (providing for payment of disputed rent into the registry of the Court).
[63] Docket No. 84 at ¶¶ 3-4.
[64] "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . . objects." 11 U.S.C. § 502(a).
[65] *See* Docket No. 84, Schedule A; *see also* Debtors' Ex. 1.

total $8,444. The schedule also identifies the sum of $3,075 which represents 41 months of late fees that the Debtors submit were wrongly assessed. In all, the Debtors assert that the prepetition arrearage identified in the proof of claim is inflated in the amount of $11,525.

At trial, the Court received into evidence numerous exhibits including payment histories, copies of canceled checks, money orders and similar materials. As with the Stay Relief Motion discussed *supra.*, the Court also received the testimony of Mrs. Ashcraft (for the Debtors) and Mr. Crawford (for Cenlar).

Mrs. Ashcraft testified at trial that she had received a payment history from the Creditor[66] that identified five missing payments over the period of between 2016-2018. She described her investigation into the issue as follows:

> Okay, I put together this missing-payment list, this was derived – this was derived from the payment history that we received directly from Citi after going – painstakingly going through all the payments for a period from 2016 through the end of 2018, we determined and confirmed that the following payments were missing on Exhibit 1. They're listed as a payment made in April of 2016 in the amount of 1686 – I think our mortgage payment was actually like 1685 and change and I would overpay it by 86, rounded off. My notations said that my bank, PNC, had paid that payment on 5/2.
>
> The next payment that was missed from the Citi payment history report was August 15th of 2018; that was a money order in the amount of $1,688. I think our mortgage payment had gone up for a few dollars.
>
> Then I had made payment on – and three payments were made in December of 2018, they too were money orders. However, the payment history only reflected that we had ever been given credit for one. The Cenlar payment history only ever – that we received in May of 2023 only indicates credit for only one of those three December 2018 payments that were made and none of the others.[67]

---

[66] Creditor's Ex. 5.
[67] Tr. (1/24/2024) 134:16-25; 135:1-11.

Mrs. Ashcraft reported that it was at times difficult to obtain documentation for certain payments because she occasionally used Western Union money orders, a service called Moneygram, and her own personal checking account.[68]

The evidence submitted at trial shows proof of payment by the Debtors for the four monthly installments in 2018 that are missing from the Creditor's prepetition payment history.[69] The Debtors' objection to Claim No. 9 as it relates to four separate payments from August and December 2018 will be sustained.

However, the testimony did not support that a payment was indeed made on account of the April 2016 mortgage bill. The Debtors' pay history (prepared by them, not the servicer) shows that a check dated April 7, 2016 bounced.[70] That same history suggests that a new check was issued by the Debtors on April 8 to cover the monthly bill, but no copy of that second check or other proof of payment for April 2016 was provided. In the absence of reliable evidence of payment, the Court will deny the Debtors' objection as it relates to the April 2016 payment in the amount of $1,686.

Finally, the Debtors object to 41 months of late fees imposed by the Creditor for the period April 2016 through September 2019 totaling $3,075. The Court will sustain that portion of the objection on the ground that the evidence adduced at trial demonstrates that the servicer's failure to clearly respond to the Ashcrafts' repeated inquiries contributed materially to the delay in resolving or sorting out the billing discrepancies. The late fees shall be stricken.[71]

---

[68] Tr. (1/24/224) 139:4-5.

[69] *See* Debtors' Ex. 5, 7 and 11.

[70] *See* Debtors' Ex. 3 at p. 1.

[71] *See* Debtors; Ex. 11 (Debtors' letter to Cenlar dated December 26, 2018); Debtors' Ex. 12 (Debtors' letter to Cenlar dated February 28, 2019).

## CONCLUSION

For the reasons stated above, the Debtors' objection to Claim No. 9 held by Citigroup will be sustained in part, and the prepetition arrearage of the Creditor's claim shall be reduced by the sum of $9,839.  Citigroup's Stay Relief Motion will be denied, and the Court will deem the Ashcrafts to be current on all of their post-petition mortgage obligations as of April 30, 2024, with regular post-petition payments by the Ashcrafts to resume starting in May 2024.  The Court will entertain a request by Debtors' counsel for an award of fees and costs, with such application being made within 30 days of the date hereof.  Citigroup will be afforded the opportunity to object to any such request within 14 days of filing.  An appropriate order will issue.

Dated: May 3, 2024

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE